IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

RONALD D. JACKSON,              )        CASE NO. 3:16CV757
                                )
          Plaintiff,            )
                                )        JUDGE JEFFREY J. HELMICK
     v.                         )
                                )        MAGISTRATE JUDGE
                                )        KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL          )
SECURITY ADMINISTRATION,        )
                                )        **REPORT AND RECOMMENDATION**
          Defendant.            )


Plaintiff Ronald Jackson ("Jackson") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his applications for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).

As set forth more fully below, the Administrative Law Judge ("ALJ") erred when she

disregarded the opinion of Jackson's treating cardiologist that he would need to avoid magnetic

fields due to his implanted defibrillator.  Specifically, the ALJ (1) failed to adequately explain

why she did not give controlling weight to the treating physician's magnetic field restriction; and

(2) erred when she determined, without the support of vocational expert testimony or any other

substantial evidence, that a magnetic field restriction would not affect the job base or job

numbers identified by the vocational expert.  As a result, the undersigned recommends that the

Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.[1]

## I. Procedural History

On July 5 and 11, 2012, Jackson filed applications for DIB and SSI, respectively, alleging a disability onset date of April 17, 2009. Tr. 216, 218. He alleged disability based on the following: heart problems, sleep apnea, right hip and knee problems, angina, heart attack, memory loss, fractured right patella, and frequent urination. Tr. 243. After denials by the state agency initially (Tr. 100, 101) and on reconsideration (Tr. 132, 133), Jackson requested an administrative hearing. Tr. 170-171. A hearing was held before Administrative Law Judge ("ALJ") Ellen Parker Bush on July 29, 2014. Tr. 31-75. In her October 20, 2014, decision (Tr. 21-25), the ALJ determined that there are jobs that exist in the national economy that Jackson can perform, i.e., he is not disabled. Tr. 23. Jackson requested review of the ALJ's decision by the Appeals Council (Tr. 8) and, on February 22, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Jackson was born in 1963 and was 48 years old on the dates his applications were filed. Tr. 275. After graduating from high school, he went to welding school and worked as a welder for 15 years. Tr. 41. He then worked for an auto parts manufacturer operating a machine in a factory. Tr. 43. Subsequently, he obtained a commercial driver's license and drove trucks. Tr. 41. He stopped driving trucks when he injured his right knee at work and his employer put him on light duty work. Tr. 41. He stopped performing that work in April 2009. Tr. 54.

---

[1] The recommendation for remand in this case is only with respect to the ALJ's treatment of the magnetic field restriction at steps four and five. All other aspects of the ALJ's decision are supported by substantial evidence and should, therefore, be affirmed.

**B. Relevant Medical Evidence**

**Knee:**  On February 26, 2007, Jackson fractured his right knee when he slipped and fell in mud while working.  Tr. 378, 384.  He had an internal fixation surgery on his right knee on February 28, 2007.  Tr. 384, 386.  Following surgery, he was given crutches and a knee brace.  Tr. 388.  He regained full range of motion and strength in his right knee by July 11, 2007, and was able to ambulate unassisted.  Tr. 395-396.  He still had some discomfort upon palpation of the anterior aspect of his right knee, attributable to irritable hardware.  Tr. 395.  X-rays showed proper healing and alignment and Steven B. Shine, D.O., explained that, although Jackson wanted the hardware removed so that he could kneel and crawl, it was too early to remove it and that it needed to remain intact for at least 18 months.  Tr. 396.  Jackson remarked that his knee was "not where I need to be to return to work" as a truck driver and that "there is no light duty work available."  Tr. 394.

Thereafter, Jackson returned to his job performing light duty work.  Tr. 399.  On August 15, 2007, he complained to Dr. Shine of right knee weakness.  Tr. 399.  Upon exam, he had a good range of motion in his right knee, some discomfort over the superior pole and no crepitus.  Tr. 399.  His x-ray results were normal.  Tr. 399.  Dr. Shine stated that Jackson could return to full duty work when he felt that his leg was stronger and should "continue to progress his strengthening exercises as given in physical therapy."  Tr. 399.  Dr. Shine noted that it was still too soon to remove the hardware and that patellar articular cartilage wear may result in the need for arthroscopic evaluation of his right knee.  Tr. 399.

On September 26, 2007, Jackson saw Dr. Shine complaining of severe pain when attempting to kneel, "catching and clicking," and pain that had not improved.  Tr. 401.  His gait was unassisted with a short stride that was safe and symmetric.  Tr. 403.  His range of motion

3

was full but painful past 110 degrees.  Tr. 402.   He had full muscle strength.  Tr. 403.  Dr. Shine's impression was irritable surgical hardware with probable symptomatic patellofemoral chondromalacia, which was likely causing his crepitus.[2]  Tr. 403-404.  Jackson had right knee arthroscopy on November 12, 2007.  Tr. 412.  On November 21, at his first follow-up visit, he stated that his pain relief was adequate.  Tr. 413.

On April 10, 2008, Jackson reported improvement in the motion of his right knee and that he was continuing his home exercises.  Tr. 341.  The "clicking and popping" had improved "but it still hurts in the front."  Tr. 341.  Upon examination, Dr. Shine noted tenderness to palpation in Jackson's right knee directly over the hardware.  Tr. 342.  He had no other pain, a full range of motion, full strength, and an unassisted and symmetric gait.  Tr. 342-343.  Dr. Shine noted that, at this point, Jackson could have his hardware removed but that a prescription drug he was taking in connection with cardiac issues (Coumadin, a blood thinner to prevent clotting) prevented him from undergoing surgery.  Tr. 343.  He further warned that Jackson may still experience some persistent discomfort despite the removal of the hardware.  Tr. 343.

On July 17, 2008, Jackson noted continued improvement since his arthroscopic surgery but complained that his right knee was still not 100 percent.  Tr. 344.  He reported daily pain, especially with bending and lifting.  Tr. 344.  Upon exam, he had a full range of motion in his right knee, albeit with pain on flexion; good motor strength but some discomfort upon extension; and a tandem, symmetric and unassisted gait, with some "start up discomfort due to anterior right knee pain."  Tr. 345.  An x-ray of his right knee showed satisfactory healing of the knee fracture, no change in the hardware, no entopic calcification and no post-traumatic arthrosis.  Tr. 346.  Dr. Shine recommended surgery to remove the hardware in Jackson's knee.  Tr. 346.

---

[2]  Chondromalacia is the softening of the articular cartilage in the patella.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 352.

On September 22, 2008, Jackson saw Dr. Shine and reported continued discomfort in his right knee, "difficulty with bent knee activities and sometimes standing and walking."  Tr. 347. Upon examination, the range of motion in his right knee was somewhat limited due to pain, he had mild weakness with extension, and no sensory deficit.  Tr. 348.  X-rays showed complete resolution of the fracture and no degenerative changes in the knee.  Tr. 349.   He still could not undergo hardware removal surgery because his cardiac condition required him to remain on Coumadin.  Tr. 349.

On February 18, 2009, Jackson continued to report pain in his right knee with range of motion; his gait remained unassisted, tandem and symmetric.  Tr. 354.

On March 5, 2009, Dr. Shine removed the hardware previously inserted in Jackson's right knee.  Tr. 339.  On March 18, 2009, Jackson had no complaints of pain and he was not taking pain medications.  Tr. 357.  X-rays showed satisfactory and unchanged alignment of the right knee with complete healing of the fracture.  Tr. 359.  Dr. Shine advised that Jackson could continue his home therapy exercises and return to light duty work at the end of the month.  Tr. 359.

At a follow-up visit on May 13, 2009, Jackson was doing well but he was unable to return to work because his "work closed up."  Tr. 366.  On examination, he had a full range of motion in his right knee and his gait was still cane-assisted but "fairly safe" and symmetrical. Tr. 368.  On June 17, 2009, Jackson reported to Dr. Shine that he had no pain in his right knee and was "getting around pretty good."  Tr. 369.   On examination, he had a full range of motion in his right knee and his gait was unassisted, tandem and symmetric.  Tr. 371.  Dr. Shine recommended physical therapy.  Tr. 371.

5

On August 29, 2009, Jackson reported that he had just gotten into physical therapy. Tr. 372. He had continued discomfort in his right knee. Tr. 372. Upon exam, he had a full range of motion and good strength. Tr. 374. Dr. Shine observed that Jackson's gait was unassisted, tandem and symmetric, though "somewhat slow." Tr. 374. Jackson stated that he thought another surgery was necessary; Dr. Shine stated that he would agree "if he would have progressive and intractable patellofemoral pain and chondromalacia symptoms." Tr. 374. Dr. Shine recommended a further evaluation with physical therapy to assess the possibility that he is at "Maximum Medical Improvement." Tr. 374. He stated that, after Jackson finishes physical therapy, he may return to regular duty work if he feels able and that his knee "is certainly stable." Tr. 374.

On September 23, 2009, Jackson saw physical therapist Melinda DePolo, P.T., for a functional capacity evaluation ("FCE") per Dr. Shine's request. Tr. 1004-1022. Jackson stated that he walks "a lot" but has difficulty climbing, kneeling, crouching and with prolonged standing. Tr. 1004-1005. He reported no difficulty with self-care and stated that he could perform chores at home but was unable to bend down. Tr. 1005. Upon exam, DePolo noted that Jackson ambulated with an antalgic gait pattern, had locking in his right knee, and external rotation in his right hip with decreased right knee flexion during the swing phase of his gait. Tr. 1006. He sat for one hour during the exam and denied an increase in pain; stood for 40 minutes and rated his pain 4/10; was able to stoop but was unable to kneel, crawl or crouch for 15 seconds even while using his hand to aid in balancing. Tr. 1016. DePolo opined that he was giving "high effort" during testing. Tr. 1008. He could lift 30 pounds from 12 inches off the floor to level with his knuckles, 30 pounds from his knuckles to his shoulders and 25 pounds overhead, but he could not lift from the floor secondary to his inability to squat and it was

recommended that lifting from the floor be avoided.  Tr. 1020.  DePolo concluded that Jackson should avoid kneeling, crouching, crawling and squatting greater than 90 degrees.  Tr. 1020.

On August 23, 2010, Jackson reported to Dr. Shine that he had recurrent discomfort in his right knee and complained that it was "just not feeling right."  Tr. 375.  He did have improvement after the hardware was removed but he still experienced activity-limiting pain.  Tr. 375.  Upon examination, he had a full range of motion in his right knee with some pain beyond 5-105 degrees, no crepitus, full strength, and an unassisted, tandem and symmetric gait.  Tr. 376.  His right foot was externally rotated.  Tr. 376.  An x-ray showed decreased patellofemoral space.  Tr. 376.  Dr. Shine discussed with Jackson the possibility of another arthroscopic evaluation but recommended conservative treatment initially, and, specifically, physical therapy with work hardening and conditioning exercises.  Tr. 377.  Dr. Shine opined, "It is my professional opinion that at age 46 he may have continued ongoing, possible permanent problems as a result of the sequelae of this patella fracture as post-traumatic arthritis does commonly develop in some individuals."  Tr. 377.

On October 10, 2012, an x-ray of Jackson's right knee showed unremarkable bony alignment without significant joint narrowing and a mild spur at his posterior patella.  Tr. 739.

**Cardiac impairment:** On February 21, 2008, Jackson had a myocardial infarction (heart attack) and underwent an emergency angioplasty and stenting.  Tr. 530, 846.  At that time, his left ventricular ejection fraction was 35 to 38%.[3]  Tr. 530.

At a follow-up appointment with cardiologist Michael Vacante, D.O., on March 10, 2008, Jackson reported no difficulties and had no chest pain or shortness of breath.  Tr. 848.  He had

---

[3]  "Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts."  *See Ejection Fraction: What does it measure?* Mayo Clinic, available at http://www.mayoclinic.org/ejection-fraction/expert-answers/FAQ-20058286 (last visited 1/25/2017). A left ventricular ejection fraction of 55% or higher is considered normal and an ejection fraction of 50% or lower is considered reduced. *Id*.

returned to "mostly normal activities" and stated that he would like to return to work in one week.  Tr. 848.  Dr. Vacante advised that Jackson could return to light duty work in one week. Tr. 848.

At his next follow-up appointment on May 12, 2008, Jackson denied chest pain or shortness of breath.  Tr. 846.  The next day he had an echocardiogram, revealing an ejection fraction of 35%.  Tr. 833.  Dr. Vacante commented that the study showed continued significant cardiac dysfunction and apical thrombus and that Jackson should remain on anticoagulation (Coumadin) therapy and be assessed for possible device therapy.  Tr. 833.

On May 21, 2008, Jackson returned to Dr. Vacante.  Tr. 869.  He reported bruising from working, explaining that he had bruising on his chest from where he "leans on metal bars to do work."  Tr. 869.  Dr. Vacante explained that this was from the medication he was taking.  Tr. 869.  Dr. Vacante spoke to Dr. Shine with respect to Jackson potentially stopping his anticoagulant medication so as to enable him to have knee surgery and explained that it would not be possible at that time for Jackson to stop his medication; his knee surgery would have to be delayed.  Tr. 869.

On October 21, 2008, Jackson visited Dr. Vacante's office and reported that he was "doing well from a cardiac standpoint" and had "[n]o complaints."  Tr. 821.

On January 26, 2009, Jackson returned to Dr. Vacante and reported no "major symptoms or problems per se."  Tr. 684.  On January 29, he had an echocardiogram and a myocardial perfusion test.  Tr. 681.  His ejection fraction was 35% per the echocardiogram and 39% per the myocardial perfusion test.  Tr. 681-683.  On February 12, 2009, Dr. Vacante cleared him to modify his heart medication so that he could undergo his knee surgery.  Tr. 677.  He observed Jackson to be ambulatory with a normal, tandem gait.  Tr. 678.

On September 14, 2009, Jackson reported to Dr. Vacante that he had no chest pain and no palpations "per se, just a little dyspnea on exertion." Tr. 673. He was doing well clinically, was performing his usual activities, and was back on Coumadin post knee surgery. Tr. 673. He was ambulatory with a normal, tandem gait. Tr. 674. On September 28 he had another echocardiogram. Tr. 863. His ejection fraction was 25% to 30% and "possibly less." Tr. 863. On October 29, 2009, Dr. Vacante discussed with him the need to consider a cardioverter-defibrillator implant ("ICD") and that "…at this point the preeminent issue is prevention of sudden cardiac death." Tr. 877. He referred him to cardiologist Kara Quan, M.D. Tr. 877. At that time, Jackson was not having any new symptoms. Tr. 877.

Jackson had another echocardiogram on November 30, 2009. Tr. 886. His ejection fraction was visibly estimated to be 25%. Tr. 886. On January 7, 2010, Dr. Vacante again discussed an ICD and a referral to Dr. Quan. Tr. 853. Dr. Vacante stated, "his ejection fraction has remained substantially low despite medical therapy and there is no expectation that left ventricular function would improve." Tr. 853.

On March 9, 2010, Dr. Quan evaluated Jackson for a defibrillator. Tr. 659-662. Jackson denied palpitations, lightheadedness, syncope, and dyspnea at rest or during exertion. Tr. 659. He reported occasionally becoming short of breath upon heavy exertion, such as playing in a band or lifting heavy objects. Tr. 659. Dr. Quan diagnosed coronary heart disease and New York Heart Association class II, stage B heart failure. Tr. 660. She recommended an ICD. Tr. 660. When Jackson expressed concern about having an ICD and being around large amplifiers when he plays in his band, Dr. Quan gave him the toll-free number for ICD companies to ask about environmental interferences. Tr. 660. He stated that he would quit playing in his band if the amplifiers would interfere with his device. Tr. 660.

9

Jackson had an ICD implanted on April 26, 2010.  Tr. 653.  At a follow-up visit with Dr. Vacante on May 5, 2010, he reported no problems.  Tr. 650.  He was ambulatory with a normal, tandem gait.  Tr. 651.

On August 2, 2010, Jackson visited his cardiologists' office and reported that he had very little energy and that his Lisinopril medication was causing him to have a hacking cough.  Tr. 645.  He also reported anginal type symptoms (pressure sensation in his chest and an "acidy" taste in his mouth) after drinking coffee or pop.  Tr. 645.  He took a friend's Nexium and his symptoms improved.  Tr. 645.  He denied taking nitroglycerin and denied cardiac chest pain and irregular palpitations.  Tr. 645.  He was provided with a prescription for omeprazole for his reflux symptoms.  Tr. 646.

On September 23, 2010, Jackson reported to Dr. Vacante that he had pain at his implantation site and shortness of breath with activities.  Tr. 884.  He was ambulatory with a normal, tandem gait.  Tr. 885.  He had an echocardiogram and myocardial perfusion scan on December 8, 2010, and these revealed an ejection fraction of 35% and 38%, respectively.  Tr. 641-642.  On December 10, he reported to Dr. Vacante that he had no new or unusual symptoms and denied chest pain.  Tr. 637.  He was ambulatory with a normal, tandem gait.  Tr. 638.

On June 20, 2011, Jackson had a follow-up visit at his cardiologists' office and was given a handicap placard for parking.  Tr. 860.  He was ambulatory with a normal, tandem gait.  Tr. 860.

On August 26, 2011, Jackson saw Dr. Quan for a follow-up visit and complained that his left foot hurt.  Tr. 631.  He explained that he and a friend stopped to help a stranded car, that the tire of the car was frozen, and that he kicked the tire with his foot.  Tr. 631.  As a result, he was using two crutches to ambulate.  Tr. 631.  He had mild swelling in his left foot and could not

flex, extend, or rotate his left foot or ankle.  Tr. 631.  He reported chronic fatigue and dyspnea on

exertion, stated that he could walk on flat ground if it is not too hot outside but complained of

getting short of breath and tired when it is hot or humid.  Tr. 631.  He had no dyspnea at rest.  Tr.

631.

On February 27, 2012, Jackson complained of some indigestion across his chest and a

racing heart.  Tr. 627.  He reported that, last week, his ICD interrogation revealed an episode of

tachycardia in October 2011.[4]  Tr. 627.  He complained that he was slightly more fatigued but

denied shortness of breath.  Tr. 627.  He had cancelled his stress test because of financial

constraints.  Tr. 627.  Dr. Quan adjusted his medications and recommended he undergo a stress

test as soon as possible.  Tr. 628.

On September 21, 2012, Jackson reported frequent episodes of angina that came "out of

the blue," described as indigestion or chest tightness.  Tr. 707.  Dr. Quan noted that he still had

not had his stress test.  Tr. 707.   Jackson denied palpitations and stated that he could perform his

activities of daily living but sometimes his ability to do this was affected by his chest discomfort,

which he experienced during exertion and at rest.  Tr. 707.  He stated that he had not tried taking

his nitroglycerin because he "never thought about it" and, moreover, it had expired.  Tr. 707.  A

myocardial perfusion scan a few days later showed an ejection fraction of 38%, representing no

change since the previous one.  Tr. 707, 723.

On October 2, 2012, Jackson was admitted for chest pain experienced "primarily while

shoveling dirt" and an abnormal stress test.  Tr. 702.  He underwent catheterization, which

revealed an ejection fraction of 30%.  Tr. 707, 696.  He also had a 100% right coronary artery

---

[4]  An ICD may be interrogated to evaluate things like battery status and to assess whether there have been any
significant events that the device has noted and stored.  *See*
http://www.hopkinsmedicine.org/healthlibrary/test_procedures/cardiovascular/implantable_cardioverter_defibrillato
r_icd_insertion_92,P08774/ (last visited 1/25/2017).

blockage and underwent an angioplasty, which reduced the lesion "down to 10 to 20%."  Tr. 702.

Post-surgery, he was stable and his shortness of breath had resolved.  Tr. 702.

On October 18, 2012, Jackson saw Dr. Vacante for a follow-up visit.  Tr. 761.  He had no

chest pain, shortness of breath, or other clinical complaints.  Tr. 761.  He was ambulatory with a

normal, tandem gait.  Tr. 762.

On January 24, 2013, Jackson saw Dr. Vacante and reported some chest pain.  Tr. 850.

He took nitroglycerin at times.  Tr. 850.  Dr. Vacante scheduled another perfusion scan and

advised Jackson to limit his activities to those that do not provoke angina.  Tr. 850.

On October 11, 2013, Jackson saw Dr. Quan and reported having angina and shortness of

breath when he performed activities such as "chopping, doing yard work or shoveling snow."

Tr. 916.  The angina did not occur "too often" and it subsided if he rested.  Tr. 916.  His

shortness of breath occurred with moderate exertion, e.g., after walking for a few minutes at a

time, and then he had to rest.  Tr. 916.  He declined additional testing or catheterization until he

"work[ed] through his paper work for finances" but did agree to follow up with Dr. Vacante after

having missed his last appointment.  Tr. 916.  Jackson also admitted that he was concerned about

having another catheterization because, the last time he had a catheterization, he had a

defibrillator shock and "he 'never wants to feel that again.'"  Tr. 916.  Dr. Quan explained that

the defibrillator shock was the appropriate mechanism for his device to save him; Jackson stated

that he understood, but would prefer to pursue treatment with medications before discussing a

stress test or catheterization.  Tr. 916.  Dr. Quan assessed New York Heart Classification II,

stage C heart failure, recurrent angina, and hypertension.  Tr. 917.

At a follow-up visit at his cardiologists' office on April 11, 2014, Jackson complained, "I

am tired all the time."  Tr. 913.  He reported pressure in his chest and some shortness of breath

with activity.  Tr. 913.  He also stated that he had had a "device interrogation" the previous day and it was reported that he had a couple of occasions in January when his heart rate went to 150 beats per minute.  Tr. 913.  He also admitted that he had been modifying the dosages of his medication due to financial constraints: he reduced one of his medications to 1 tablet down from 1 ½ tablets and discontinued taking two other medications.  Tr. 913.  He stated that he was filling out paperwork for financial assistance and believed that his medications would be covered in the future.  Tr. 913.  On April 15, 2014, he had another myocardial perfusion showing an ejection fraction of 37%, deemed similar to what it was before.  Tr. 908, 911.  On April 21, 2014, Dr. Vacante observed that Jackson had no defibrillator discharges and that he had some dyspnea while shoveling snow in the past, but his ejection fraction was a bit higher than in the past, he was currently "doing well otherwise clinically," and had had no major angina events.  Tr. 908.

### C.  Medical Opinion Evidence

#### 1.  Treating Source Opinion

On July 18, 2014, Dr. Quan completed a Work Restriction Report.  Tr. 1029.  She opined that Jackson had no restrictions on his ability to sit, stand, or walk and could do so 8 hours a day; she also noted that he had knee pain and intermittent angina that would reduce his activity/exercise tolerance.  Tr. 1029.  She found that he would need to alternate positions often and at will to relieve pain, could lift and carry up to 35 pounds occasionally and frequently; and would need to avoid exposure to fumes, odors, gases, pollutants, extreme temperatures, humidity, and magnetic fields.  Tr. 1029.  The magnetic field restriction was apparently due to

13

the fact that Jackson had an implanted defibrillator.[5]  Overall, she assessed his chest pain as moderate.  Tr. 1029.

### 2. Consultative Examiner

On October 10, 2012, Jackson saw Marsha Cooper, M.D., for a consultative examination. Tr. 742-748.  Upon exam, Dr. Cooper found that Jackson had normal motor strength in his extremities, full range of motion in his knees, and a normal gait.  Tr. 742, 745, 748.  She opined that Jackson did "not appear to have a major problem with his bones and joints."  Tr. 748.  Due to his cardiac condition, she opined that he could not perform any type of work "that is at all exertional."  Tr. 748.  She further opined that he avoid any jobs that require him to be exposed to temperature extremes or any jobs that would induce severe stress.  Tr. 748.  She noted, "He has a cardiac pacemaker defibrillator and the significance of this would be that his cardiac function is quite poor."  Tr. 748.

On February 6, 2013, Dr. Cooper filled out a "limited cardiovascular/pulmonary/pre-exercise test" form.  Tr. 904-905.  She noted that Jackson reported that he had "lingering" pinpoint sharp precordial pain in his right jaw and neck "and says 'heartburn.'"  Tr. 904.  The pain lasts five minutes and nitroglycerin was effective. Tr. 904.  He also stated that he became short of breath on physical activity and was easily fatigued.  Tr. 904.  Dr. Cooper commented that Jackson's chest pain was "noncardiac" and that he complained of "significant dyspnea [] on exertion and this limits his activities."  Tr. 905.  She observed that Jackson found the discharge of his defibrillator "unsettling."  Tr. 905.

On October 15, 2012, Jackson saw Thomas Evans, Ph.D., for a psychological evaluation. Tr. 750-756.  Jackson reported attending regular classes in school.  Tr. 751.  Upon mental status

---

[5]  "[E]xposure to strong electrical or magnetic fields, such as from MRI (magnetic resonance imaging), can trigger or reprogram an implanted cardiac defibrillator, resulting in inappropriate shocks."  20 CFR Part 404, Subpart P, Appendix 1, 4.00F4(a).

examination, he exhibited adequate attention and concentration.  Tr. 752.  On the Wechsler Adult Intelligence testing, he scored a full scale IQ of 83, which placed him in the low-average range. Tr. 754.  Dr. Evans assessed that Jackson had no diagnosable mental disorder and had a global assessment of functioning (GAF) score of 80.[6]  Tr. 756.  He opined that Jackson would be capable of "understanding, remembering and carrying out at least simple instructions in the work place setting."  Tr. 756.

### 3. State Agency Reviewers

On February 7, 2013, state agency reviewing physician Gary Hinzman, M.D., reviewed Jackson's record.  Tr. 82-84.  Regarding Jackson's residual functional capacity ("RFC"), Dr. Hinzman opined that Jackson could sit, stand and walk about 6 hours out of an 8 hour workday; lift 20 pounds occasionally and 10 pounds frequently; could occasionally climb ramps and stairs but never ladders, ropes or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to extreme heat, cold, wetness and humidity; must avoid all exposure to hazards such as machinery and heights; and must avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation.  Tr. 84.

On May 7, 2013, state agency reviewing physician Leslie Green, M.D., reviewed Jackson's record and adopted Dr. Hinzman's findings, except that she restricted Jackson to avoiding concentrated exposure to all environmental limitations.  Tr. 111-112.

### D. Testimonial Evidence

#### 1. Jackson's Testimony

---

[6] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 71 and 80 indicates that, "[i]f symptoms are present, they are transient and expectable reactions to psychological stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *Id*.

Jackson was represented by counsel and testified at the administrative hearing.  Tr. 33-62. He testified that he lives in a trailer with his mother, who came to live with him after his father passed away.  Tr. 33, 38-39.  He has to take care of her because she has diabetes, Alzheimer's and dementia.  Tr. 40.  He gives her insulin shots daily and is with her 24 hours a day.  Tr. 39-40. She is able to bathe herself but he has to watch that she does not fall.  Tr. 40.  He supports himself and his mother with the money his mother receives from her estate.  Tr. 42.  He does not get food stamps and he does not have health insurance or Medicaid because he did not sign up for them.  Tr. 42, 43.  He did not think welfare was "around anymore" and he thought that Medicaid came with Social Security.  Tr. 42, 43.  He is able to drive and borrowed his son's car to get to the hearing.  Tr. 39.  He drives a couple of times a week.  Tr. 39.  He attended physical therapy a few years ago for his knee.  Tr. 40.

After he graduated from high school, Jackson went to welding school and became a welder for 15 years.  Tr. 41.  He stopped being a welder because it was hard to breathe because of all the smoke.  Tr. 41.  Then he began working in an auto parts factory but stopped that job because "I don't think that they would give me a raise" and he was tired of breathing the powder that resulted from operating the machines in the factory.  Tr. 45.  He began driving a truck, for which he had to get a commercial driver's license ("CDL").  Tr. 41.  He keeps his CDL current but "can't really drive anymore" because he cannot bend down due to his right knee.  Tr. 41.  He also has a "climbing issue" due to his right knee.  Tr. 41.  It is hard for him to sit for more than an hour in the truck to drive; usually, the job required the driver to sit for up to 11 hours a day, which he cannot do anymore.  Tr. 49.

After he hurt his knee, in 2007, he was placed on light duty work.  Tr. 41.  He tried driving a truck a few times but it was too much for him so he returned to light duty.  Tr. 41.  He

performed light duty work for four years for the trucking company, mostly working in the office keying in data on the computer and organizing the drivers' logs.  Tr. 46.  He would answer the phones if somebody needed something and he also walked around and inspected the trucks in the morning, noting their condition and making sure they were fully equipped.  Tr. 47.  There were about 20-30 trucks there on the weekend.  Tr. 48.  He would also drive to go pick up a load if necessary and he would go with a co-worker; he only did this for about a week because then he had a heart attack.  Tr. 48.  He performed his light duty work a few days a week and "the other couple days I stayed home."  Tr. 49.  He still got paid, even though he stayed home, because it was part of his worker's compensation claim.  Tr. 49.  It was not a job that would be offered or available to any person, it was created for him.  Tr. 61.  When the trucking company terminal closed up, he could no longer work light duty.  Tr. 49.  He was on regular disability until worker's compensation sent him to vocational training "but they didn't really do anything."  Tr. 49.  He is no longer receiving payments from his worker's compensation claim.  Tr. 52.

Jackson testified that he could not work because of the heart condition he has now; he gets out of breathe easily and gets tired all the time because his heart is not pumping right.  Tr. 55.  He starts breathing hard when it is hot outside.  Tr. 55.  He could work about 10 minutes before getting tired.  Tr. 55.  When asked to describe something that would make him tired after 10 minutes, he stated, "Picking up sticks in the yard, or raking sticks in the yard or something like that.  Anything physical, I'm shot."  Tr. 56.  Even if he did not have a knee problem, he could not drive a truck because of his weak heart.  Tr. 56.  He explained that climbing up on the truck would wear him out, as well as lifting heavy chains and timbers and tarps; these things are now too physical for him.  Tr. 56.  He also has a defibrillator and would be afraid that it would go off.  Tr. 56.

Jackson performs all the household chores but gets help from his children when they come over.  Tr. 57.  He washes the dishes, cooks and vacuums "a little bit" and washes his and his mother's laundry.  Tr. 57.  He is able to take care of his personal needs and does not need help, although the last time he was at the doctor's office the doctor tied his shoes because he could not bend down.  Tr. 58.  He has a washing machine in his trailer and he hangs the laundry up to dry.  Tr. 57.  He only washes a few things at a time.  Tr. 57.  He goes grocery shopping about once a week.  Tr. 57.  He pays a neighbor to shovel snow.  Tr. 57.   He does not go out for entertainment; he watches television and has not gone fishing in 20 years.  Tr. 58.  He used to garden but can no longer because he cannot bend down anymore.  Tr. 62.  He enjoyed restoring antique cars and tractors but no longer is able to because he can no longer bend down.  Tr. 58.  Also, his knee locks up on him sometimes and there is no cartilage left in between the bones.  Tr. 58.  He wanted to get a knee replacement but "they wouldn't.  They said I was too young."  Tr. 58.  He smokes about a half a pack of cigarettes a week.  Tr. 59.

Jackson stated that he can stand for maybe five minutes in one spot, without moving, and has to move around a lot because his leg bothers him.  Tr. 59.  It feels better when he walks around and not walking around makes his knee sometimes lock up.  Tr. 59.  He can sit for about a half an hour before having to get up because of leg pain.  Tr. 59.  He also has problems with his hips because of the way he has walked for so long.  Tr. 59.  When he was in physical therapy he had his foot bandaged to track straight because it had turned out, but that was painful and it did not work.  Tr. 60.  The heaviest thing he has picked up recently was a watermelon that weighed about 10 pounds.  Tr. 60.  He can lift a little more than that.  Tr. 60.  He could "probably" pick up a 20 pound bag of potatoes and move it a little bit.  Tr. 60.  He could not carry a 35 pound bag of charcoal; he could maybe lift it but then would have to put it in something, he could not carry

18

it. Tr. 60. If he could "lop along" setting it down and picking it up, he could probably transport it the length of the hearing room. Tr. 60-61. He "can't really climb up stairs very easy at all." Tr. 61. Hs knee grinds together and he has to hold on to the railing and "just ease up and down." Tr. 61. He has a cane and uses it when he has to "walk any distance on concrete." Tr. 61. He would need it to walk the block and a half from the hearing to get to the car. Tr. 62. When he goes to the grocery store he goes right to a cart and leans on the cart. Tr. 62.

### 2. Vocational Expert's Testimony

Vocational Expert Everetts ("VE") testified at the hearing. Tr. 62-73. The ALJ discussed with the VE Jackson's past work. Tr. 63-65. The VE stated that, with respect to the office work that Jackson described, because the job also involved walking around the yard and checking to see if the trucks were appropriately equipped and taking inventory, it was a combination of office worker (data entry) and warehouse worker. Tr. 64. She stated that these two jobs would not typically be found together and, as a result, there was no DOT title for this type of job. Tr. 64.

The ALJ asked the VE to determine whether a hypothetical individual could perform Jackson's past work if that person had the following characteristics: can lift 20 pounds occasionally and 10 pound frequently; can stand, walk and sit for six hours in any combination; can occasionally climb ramps and stairs, can never climb ladders, ropes and scaffolds, and can occasionally balance, stoop, kneel, crouch and crawl; and must avoid concentrated exposure to temperature extremes and humidity, moderate exposure to respiratory irritants, and all exposure to commercial driving, working around dangerous machinery and working at unprotected heights. Tr. 67. The VE answered that such an individual could perform Jackson's past work as a data entry clerk. Tr. 67. The ALJ asked the VE if there were other jobs that the hypothetical

individual could perform and the VE answered that such an individual could perform the following light, unskilled jobs: packer (300,000 national jobs, 15,000 Ohio jobs); inspector (130,000 national jobs, 6,000 Ohio jobs); and assembler (450,000 national jobs, 23,000 Ohio jobs).  Tr. 67-68.  The ALJ asked the VE what her answer would be if the individual was limited to standing and walking 3 hours a day.  Tr. 68.  The VE answered that she would consider the jobs of inspector and assembler to be with a sit/stand option and the numbers would therefore be reduced as follows: inspector (30,000 national jobs, 1,800 Ohio jobs); and assembler (90,000 national jobs, 4,000 Ohio jobs).  Tr. 68.  The hypothetical individual could no longer perform the packager job but could perform work as a cashier (200,000 national jobs, 9,000 Ohio jobs).  Tr. 68.

Next, the ALJ asked the VE if a hypothetical individual could perform Jackson's past work if that individual could lift 35 pounds occasionally and 10 pounds frequently; stand and walk 4 hours and sit for 6 hours; occasionally balance, kneel and crouch; must avoid temperature extremes, respiratory irritants, and concentrated exposure to moving machinery and unprotected heights; and, due to occasional chest pain or shortness of breath, would have to sit or stand at will.  Tr. 69.  The VE stated that the only past work that would allow for a sit/stand option would be data entry.  Tr. 69.  The ALJ asked if there were other jobs that such an individual could perform, and the VE answered that there would be no jobs in the medium category that would fit the hypothetical individual, but that such an individual could perform the same light work identified by the VE in response to the ALJ's prior hypothetical.  Tr. 69.

Jackson's attorney asked the VE whether her answer would change if the hypothetical individual must avoid exposure to magnetic fields.  Tr. 69.  The VE replied that she has no information about whether assemblers and inspectors would have exposure to magnetic fields.

Tr. 70.  Jackson's attorney next asked the VE whether the hypothetical individual posed by the ALJ would be able to perform the jobs the VE identified if the individual must change position often and at-will by alternating between sitting, standing and lying at irregular intervals.  Tr. 70. The VE stated that, as far as she was aware, none of the jobs she identified would allow an individual to lie down.  Tr. 70.  Jackson's attorney asked whether the ALJ's prior hypothetical individual could perform past work or any other work if that individual must avoid fast-paced or machine-paced work activities that require medium or fine motor dexterity.  Tr. 70.  The VE stated that the individual could perform the jobs previously identified (packer, inspector, assembler) but that the assembler's numbers would be reduced by 50%.  Tr. 70.

Next, Jackson's attorney asked the VE if her answers to the ALJ's hypotheticals would change if the hypothetical individual could lift the weight that the ALJ described but could not perform that lifting from floor to knuckle height, and the object would have to be at least 12 inches from the floor in order for the individual to be able to lift.  Tr. 70.  The VE replied that such a limitation would preclude employment.  Tr. 71.  Jackson's attorney asked the VE whether the jobs she previously identified could still be performed by the ALJ's hypothetical individual if that individual could not balance.  Tr. 71.  The VE answered that none of the jobs she identified required balancing, so the individual could still perform those jobs.  Tr. 71.  Jackson's attorney asked if the VE's answer would change if the individual was limited to frequent above-shoulder work, and the VE responded that the only job that requires occasional above-shoulder work is the assembler position, and that she would normally reduce the number of assembler positions available, but that, having already reduced the number of assembler positions for the sit/stand and fast-paced production, she did not believe that the numbers she provided would be reduced further.  Tr. 71.  Jackson's attorney asked the VE if the number of jobs identified would change

if the individual could only perform frequent fine motor dexterity, and the VE answered that the jobs and the number of jobs would not change.  Tr. 72.  Jackson's attorney asked if the VE's answer would change if the individual was limited to frequent medium hand dexterity.  Tr. 72.  The VE stated that such a limitation would be a handling, fingering and feeling limitation and that, at the frequent level, the individual could still perform the jobs identified.  Tr. 72.  Jackson's attorney then asked the VE to further assume that the individual needed to use a cane for walking; the VE stated that such an individual could still perform the jobs identified because the individual could perform the lifting and carrying requirements with the hand not carrying the cane.  Tr. 72-73.  If the individual could not manage the weight with one hand, then the individual could not perform the jobs identified.  Tr. 73.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[7] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her October 20, 2014, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.  Tr. 15.

2.      The claimant has not engaged in substantial gainful activity since April 17, 2009, the alleged onset date.  Tr. 15.

---

[7] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3.      The claimant has the following severe impairments: Ischemic Cardiomyopathy Status Post Cardioverter-Defibrillator Implant; Coronary Artery Disease Status Post Stent Insertion; Status Post Right Knee Open Reduction and Internal Fixation and Bursectomy.  Tr. 15-16.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 16.

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: the claimant can lift 20 pounds occasionally, frequently lift 10 pounds; the claimant can only stand or walk for 3 hours per day; the claimant can sit for 6 hours per day; the claimant can occasionally climb stairs and ramps; never climb ladders, ropes and scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; the claimant must avoid concentrated exposure to temperature extremes and humidity; must avoid moderate exposure to respiratory irritants; must avoid all exposure to commercial driving, working around dangerous machinery, and working at unprotected heights.  Tr. 17.

6.      The claimant is unable to perform any past relevant work.  Tr. 23.

7.      The claimant was born on November 16, 1963 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age.  Tr. 23.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 23.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 23.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 23.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 17, 2009, through the date of this decision.  Tr. 25.

### V. Parties' Arguments

Jackson objects to the ALJ's decision on five grounds.  He argues that the ALJ erred by: (1) finding that Jackson did not medically equal a listing and failing to call a medical expert to testify; (2) formulating an RFC that is not supported by substantial evidence and violates the treating physician rule; (3) improperly assessing Jackson's credibility; (4) usurping the role of the VE regarding the impact of magnetic fields on the occupational base; and (5) posing a hypothetical question to the VE that was not based on substantial evidence.  Doc. 11, p. 1, 12-23. In response, the Commissioner submits that the ALJ did not err in her determination and her decision is supported by substantial evidence.  Doc. 14, pp. 11-24.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err at Step Three.

Jackson argues that the ALJ erred when she did not find that Jackson medically equaled a listing and when she failed to call a medical expert ("ME") to testify as to whether Jackson medically equaled a listing.  Doc. 11, p. 12.

An ALJ "is responsible for deciding the ultimate legal question whether a listing is met or equaled."  Soc. Sec. Ruling 96-6P, at *3.  A state agency reviewing physician's opinion on the issue of equivalence suffices to show that the question was considered by a medical consultant.  *Id*.  When an ALJ considers whether a claimant's impairments medically equals a listing, she is not required to obtain an additional, updated medical expert opinion unless she decides that obtaining such an opinion would be reasonable.  *Id*., at *3-4.  Here, the record contained a recent opinion from Jackson's primary cardiac provider and state agency reviewers' opinions on the issue of equivalence (Tr. 82, 109) and the ALJ found that an additional, updated medical expert opinion was not needed (Tr. 13); accordingly, she was not required to obtain an updated medical expert opinion.  *See id*.  Jackson concedes, "Clearly, the regulations do not require that a medical advisor be retained to testify in every case."  Doc. 11, p. 13.  The ALJ's decision to not obtain a medical expert was not erroneous.[8]

Jackson attempts to find fault with the ALJ's conclusion that a medical expert was not warranted, arguing that her decision was based on the fact that Dr. Quan provided an opinion regarding Jackson's cardiac functioning but that the ALJ only gave Dr. Quan's opinion "significant, but not great weight."  Doc. 11, p. 13 (citing Tr. 13, 21).  That the ALJ gave Dr. Quan's opinion "significant, but not great weight," does not change the fact that Dr. Quan's opinion was evidence in the record and that the ALJ, provided with all evidence of record, found that she did not need an additional medical expert opinion.  This was not error.

---

[8]  Jackson states, "The Commissioner's rules require ME testimony when considering listing equivalence.  HALLEX 1-2-5-34.  Because listings equivalence is at issue in this case, it is urged that the ALJ was required to obtain ME testimony."  Doc. 16, p. 3.  But HALLEX 1-2-5-34 requires an ALJ to obtain an ME if she "is considering finding that the claimant's impairment(s) medically equals a listing," not when an ALJ "considers listing equivalence."  If an ALJ was required to obtain an ME every time she considered whether a claimant equaled a listing, an ALJ would be required to obtain ME testimony in every social security review, which is "clearly" not contemplated by the regulations (as Jackson concedes (Doc. 11, p. 13)).  Moreover, Jackson has not provided legal authority supporting his apparent assertion that HALLEX procedures are binding on courts reviewing social security proceedings.

Jackson's argument that the ALJ erred when she found that he did not equal a listing also fails.  Jackson does not describe what impairments he had that he alleges combined to equal a listing.  He only references his ejection fraction in the 30% "range," states that "his [cognitive] scores suggest borderline intellectual functioning," and claims that he "has an antalgic gait and postural limitations as a result of his fractured patella and multiple knee surgeries."  Doc. 11, p. 13.  Jackson has the burden of identifying evidence demonstrating that he may equal a listing, which he has not done.  *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." (emphasis in original)).  Moreover, the record evidence Jackson cites does not support his assertion that he has an antalgic gait and postural limitations.  *See* Doc. 11, p. 13 (citing Tr. 378-384 (February 28, 2007, note from Dr. Shine finding that Jackson, after breaking his right knee two days prior to his visit and prior to any surgery to repair his knee, exhibited reduced strength, was not tested for range of motion due to pain, and walked on crutches); Tr. 387 (March 28, 2007 note from Dr. Shine one month after Jackson's knee surgery; Jackson visited after "he fell three days ago right on the knee"; x-rays showed no change from prior x-ray and the only physical exam finding was a comfortable range of motion through 10-75 degrees); Tr. 412 (A "surgery schedule request" signed by Dr. Shine dated October 31, 2007, with no physical exam findings); Tr. 372-374 (August 2009 treatment note showing a full range of motion and good muscle strength in Jackson's right knee and a symmetric, unassisted, tandem gait that is "somewhat slow.")).  None of these records relied upon by Jackson show that his knee impairment caused him to have an antalgic gait and postural

27

limitations.  Instead, they show that he broke his knee when he fell in February 2007 and that it was painful and difficult for him to walk shortly after breaking it.

The ALJ did not err in her Step Three determination.

**B. The ALJ's consideration of opinion evidence**

Jackson argues that the ALJ erred when she considered the opinion of his treating cardiologist Dr. Quan, the opinion of consultative examiner Dr. Cooper, and the opinion of physical therapist DePolo, and that, as a result, the ALJ's RFC determination is not supported by substantial evidence.  Doc. 11, pp. 14-18.

> **1**.  **The ALJ erred when she disregarded the portion of Dr. Quan's opinion with respect to the magnetic field restriction but did not err when she considered the remainder of Dr. Quan's opinion**

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ considered the opinion of Dr. Quan, Jackson's treating cardiologist, as follows:

Despite these allegations [of extreme fatigue], Dr. Quan indicated that the claimant could perform a range of medium work in July 2014.  Dr. Quan opined that the claimant had no restrictions with sitting, standing, or walking in an 8-hour workday.  The claimant should also avoid exposure to pulmonary irritants and avoid extremes of temperature and humidity.  She opined that the claimant can lift up to 35 pounds on a frequent basis but would require to shift positions at will to alleviate pain.  There is little support within the record for finding that the claimant requires a sit/stand option because of his chronic knee pain.  The claimant displays a consistently normal gait during his alleged period of disability and received very little documented treatment for this impairment after 2010.  However, I found the remainder of this opinion quite persuasive when evaluating the claimant's functional limitations from his cardiac impairment.  As the claimant's long-time treating cardiac provider, Dr. Quan is in the best position to provide a reliable assessment of the functional limitations flowing from the claimant's cardiac impairments.  In addition, this opinion is consistent with the overall weight of the evidence of record, which shows that the claimant is capable of performing at least light work (17F).

Dr. Quan also opined that the claimant should avoid magnetic fields in the workplace, possibly due to the claimant's defibrillator.  First, there is no indication outside of this opinion that the claimant needs to avoid magnetic fields.  Second, there is little support for finding that this limitation, even if included within the residual functional capacity, would have any significant impact on work available in the regional or national economy.  The undersigned discusses this issue further within Finding 10.  In addition, while Dr. Quan outlines moderate chest pain that could cause marked hardship when performing exertional activities and that interfere with concentration, the remainder of Dr. Quan's opinion supports finding that limiting the claimant to light work would not impact the claimant's physical or mental abilities.  Therefore, I gave this opinion significant, but not great, weight when evaluating the claimant's residual functional capacity (17F).

Tr. 21.

Jackson first argues that the ALJ erred because, despite acknowledging that Dr. Quan opined that Jackson had New York Heart Association ("NYHA") classification class II stage C heart failure, this diagnosis is "clearly" not consistent with the ALJ's RFC assessment that Jackson can perform light work.  Doc. 11, p. 16.  This argument fails because, despite diagnosing Jackson with NYHA class II stage C heart failure, Dr. Quan opined that he could stand, walk and sit 8 hours a day and frequently lift 35 pounds.  Tr. 1029.  The ALJ did not err when she limited Jackson to standing or walking 3 hours a day, sitting for 6, and lifting 10 pounds frequently and

20 pounds occasionally because Jackson's treating cardiologist opined that he could do more

than the ALJ's RFC assessment even with NYHA class II stage C heart failure.[9]

Next, Jackson argues that the ALJ erred in assessing Dr. Quan's opinion because Dr.

Quan opined that he should avoid exposure to respiratory irritants but the ALJ's RFC limited

him to avoiding only moderate, not all, exposure to respiratory irritants.  Doc. 11, p. 16.  This

argument fails.  The form that Dr. Quan filled out did not provide options specifying the level of

exposure, i.e., all exposure, concentrated exposure or moderate exposure.  Tr. 1029.  The ALJ

limited Jackson to moderate exposure to respiratory irritants based on the state agency reviewer's

opinion that did specify he should be limited to moderate exposure.  Tr. 22, 84.  It was not error

for the ALJ to rely on the state agency reviewing physicians' opinions to define what level of

exposure Jackson should be limited to.  *See Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149,

157 (6th Cir. 2009) (The responsibility for determining a claimant's residual functional capacity

rests with the ALJ, not a physician, and the ALJ "is not required to recite the medical opinion of

a physician verbatim in his residual functional capacity finding.").  Jackson's argument that the

ALJ erred in relying on the state agency reviewing physicians' opinions when those physicians

rendered their opinions prior to the date of Dr. Quan's opinion also fails.  *See McGrew v.*

*Comm'r of Soc. Sec.*, 343 Fed. App'x 26, 32 (6th Cir. Aug. 19, 2009) (rejecting an argument that

the ALJ erred when he relied on a state agency reviewer's opinion that, in turn, was based on an

incomplete record when the ALJ reviewed the complete record); *Helm v. Comm'r of Soc. Sec.*,

405 Fed. App'x 997, 1002 (6th Cir. 2011) ("There is no categorical requirement that the non-

treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case

---

[9]  Jackson characterizes Dr. Quan's opinion as finding that Jackson is "very limited as a result of his cardiac condition."  Doc. 11, p. 15.  A determination that Jackson could stand and walk for 8 hours in a workday and frequently lift 35 pounds, as Dr. Quan's, cannot be described as "very limited"; indeed, it is less limiting than the ALJ's RFC assessment finding that Jackson could stand or walk for 3 hours in a workday.

record. The opinions need only be 'supported by evidence in the case record.'") (discussing SSR 96-6p, 1996 WL 374180, at *2 (1996)); *Kelly v. Comm'r of Soc. Sec.*, 314 Fed. App'x 827, 831 (6th Cir. 2009) ("Absent a clear showing that the new evidence renders the prior [state agency reviewer's] opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand.").

However, Jackson's remaining argument has merit: the ALJ erred when she disregarded Dr. Quan's opinion that he must avoid magnetic fields. Tr. 1029. The ALJ disregarded this restriction, noting that there was no other indication in the record, beyond Dr. Quan's opinion, that Jackson needed to avoid magnetic fields. This rationale rings hollow, given that Dr. Quan was Jackson's treating cardiologist and the surgeon who installed his defibrillator. The ALJ's second reason for rejecting this restriction—that it would not have a significant impact on the work available in the national and regional economy—is not a reason for disregarding Dr. Quan's magnetic field limitation. *See* 20 C.F.R. § 404.1527.

The ALJ, therefore, erred because the reasons she gave for disregarding Dr. Quan's environmental restriction that Jackson must avoid magnetic fields were not acceptable reasons for failing to give this portion of Dr. Quan's opinion controlling weight. *See Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(c)(2). Accordingly, the case must be remanded. On remand, the ALJ will reassess the magnetic field restriction and either give this restriction controlling weight or explain why she does not give this restriction controlling weight in a manner that is consistent with the regulations.[10]

### 2. The ALJ did not err when she considered Dr. Cooper's opinion

---

[10] In a parenthetical, Jackson asserts that the ALJ's finding with respect to the magnetic field limitation "illuminates the error made when the ALJ denied the request for medical advisor testimony" at Step Three. Doc. 11, p. 20. The environmental restriction of avoiding magnetic fields is not a description of an impairment that implicates the listings. Rather, it is an RFC restriction that potentially affects the kind of jobs or the number of jobs that Jackson could perform. Accordingly, the ALJ's error with respect to a magnetic field restriction does not require reversal of her Step Three determination or her determination that a medical expert is not required.

The ALJ considered the opinion of Dr. Cooper, the consultative examiner:

> The claimant did undergo a medical consultative examination in October 2012, however that examination contained relatively benign objective findings.  The claimant's physical examination at this appointment appeared completely normal, including normal extremities, normal cardiac functioning, and a normal gait.  Although she observed these normal findings, consultative examiner Marsha Cooper, M.D., opined that the claimant could not perform any work; however, she attributed this limitation to the claimant's cardiac impairments.  Dr. Cooper actually stated that the claimant does not have any major problems with his bones and joints.  Dr. Cooper's assessment that the claimant cannot perform any type of work because of his cardiac impairment is inconsistent with the overall weight of the evidence of record, for reasons outlined later in this decision.  However, Dr. Cooper's statement that the claimant does not suffer from any major problems with his bones and joints is consistent with the overall weight of the evidence of record, particularly considering that lack of documented treatment for the claimant's right knee after August 2010.  Furthermore, at the majority of the claimant's physical examinations performed after August 2010 the examiners observed no significant gait abnormalit[ies] nor difficulties using the lower extremities.  Therefore, I gave Dr. Cooper's opinion only some weight, and only to the extent that it is consistent with the overall weight of the evidence of record (7F).

Tr. 19.  She continued:

> The undersigned continues to give only some weight to the opinion of medical consultative examiner Marsha Cooper, M.D., who opined that the claimant cannot work because of his cardiac issues with significant dyspnea that limits the claimant's activities. Dr. Cooper made this finding despite a normal physical examination and despite the fact that even Dr. Cooper noted that the claimant's chest pain was non-cardiac in origin. Furthermore, this opinion is inconsistent with the findings of Dr. Quan, who found that the claimant could perform a range of medium work.  Therefore, I gave this opinion little weight in terms of Dr. Cooper's opinion regarding the claimant's cardiac functioning. Her opinion regarding the impact of the claimant's right knee impairment remains consistent with the overall weight of the evidence of record (7F; 11F).

Tr. 22.

Jackson argues that the ALJ "cherry-picked" portions of Dr. Cooper's opinion because

(1) she did not accept Dr. Cooper's opinion that Jackson's cardiac impairment precluded all

work and (2) she did accept Dr. Cooper's opinion that Jackson does not have major problems

with his bones and joints.  Doc. 11, p. 15.  As for (1), the ALJ explained that she rejected Dr.

Cooper's opinion because it was inconsistent with the opinion of Dr. Quan, Jackson's treating

cardiologist, and inconsistent with Dr. Cooper's own findings upon examining Jackson and her opinion that Jackson's chest pain was not cardiac in origin.  In other words, Dr. Cooper's opinion was inconsistent with other evidence in the record and unsupported by her own notes and examination findings.  *See* 20 C.F.R. § 404.1527(c) (an ALJ evaluates a non-treating source opinion by considering the supportability and consistency of the opinion, the specialization of the medical source, and any other factors raised by the claimant or others).  Moreover, an opinion that Jackson is unable to work is not a medical opinion; it is an issue reserved to the Commissioner. § 404.1527(d).

As for (2), the ALJ explained that she accepted Dr. Cooper's opinion that Jackson does not have major problems with his bones and joints based on Dr. Cooper's "completely normal" exam findings, which included extensive range of motion testing and manual muscle testing.  Tr. 19, 742-745.  *See* 20 C.F.R. § 404.1527(c) (an ALJ evaluates a non-treating source opinion by considering the supportability of the opinion).  The ALJ also accurately pointed out that Jackson did not seek treatment for his knee impairment after August 2010 and that, after that date, he was not observed by providers to have significant gait abnormalities or difficulty using his lower extremities.  Tr. 19.  Jackson does not contest the accuracy of this finding.  Instead, he suggests that "after three knee surgeries it became apparent that little more could be done to restore function."  Doc. 16, p. 5.  A suggestion as to why Jackson may have failed to seek treatment for his knee impairment does not disturb the ALJ's finding, which is supported by substantial evidence.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (A court "defer[s] to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'").

33

### 3. The ALJ did not err when she considered physical therapist DePolo's opinion

Jackson also argues that the ALJ cherry-picked the evidence contained in the functional capacity evaluation completed by physical therapist DePolo in September 2009. Doc. 11, p. 15. He criticizes the ALJ for disregarding the handling and fingering limitations contained in that evaluation based on a lack of medical evidence while accepting the findings as to Jackson's difficulty kneeling, crouching and crawling. Doc. 11, p. 15. But there is no requirement that an ALJ must adopt or reject, *in toto*, assessments and opinions by providers. And the ALJ provided reasoned explanations for her treatment of DePolo's findings:

> This assessment noted that the claimant had below average upper extremity strength and function, below average skill with medium hand dexterity, and below average fine motor skills. Despite these findings, the claimant had no difficulty using hand tools during the examination. I gave these findings little weight, as there is no documented physical impairment that affects the claimant's upper extremities.

Tr. 19. Jackson does not dispute that he had no difficulty using hand tools during the examination or that there is no evidence indicating that he had an impairment in his upper extremities. The ALJ's reason for discounting this portion of DePolo's assessment is not erroneous. *See* 20 C.F.R. § 404.1527(c) (an ALJ evaluates a non-treating source opinion by considering the supportability and consistency of the opinion).

As for DePolo's assessment that Jackson had difficulty kneeling, crouching and crawling, the ALJ stated that she accounted for these postural limitations in her RFC assessment and detailed the evidence of record regarding Jackson's knee impairment, including his knee surgeries; his lessening but still present knee pain during and after the time of his surgeries; his primarily normal examination findings, including Dr. Cooper's extensive examination in 2012; his lack of treatment for knee pain after August 2010 (11 months after DePolo's assessment);

34

and his providers' observations after August 2010  that he exhibited a normal gait.  Tr. 18-19.

This explanation complies with the regulations.  *See* 20 C.F.R. § 404.1527(c).

DePolo is not an acceptable medical source.  20 C.F.R. § 404.1513(d) (other, non-

acceptable medical sources include therapists).  Jackson identifies no legal authority requiring an

ALJ to adopt all restrictions in an opinion provided by a non-acceptable medical source.  *See*

*Walters*, 127 F.3d at 530 (an ALJ is not required to adopt the opinions of a non-acceptable

medical source, citing § 404.1513).  The ALJ did not err when she considered DePolo's opinion.

**C. The ALJ did not err when she considered Jackson's credibility**

Jackson argues that the ALJ erred when she considered his credibility.  Doc. 11, p. 18.

To evaluate the credibility of a claimant's symptoms, an ALJ considers the claimant's

complaints along with factors such as the objective medical evidence, treating or nontreating

source statements, treatment received, and other evidence.  20 C.F.R. § 404.1529; SSR 96-7p,

1996 WL 374186, at *1.  The ALJ's credibility determination "must be grounded in the evidence

and articulated in the determination or decision."  *Id*. at *4.  The ALJ's decision must be

"sufficiently specific to make clear to the individual and to any subsequent reviewers the weight

the adjudicator gave to the individual's statements and the reasons for that weight."  *Id*.

Jackson first contends that the ALJ's finding that the majority of his treatment records

note that he can maintain a normal gait without any assistance is "not based on substantial

evidence."  Doc. 11, p. 18 (citing Tr. 18-19).  The undersigned disagrees.  The ALJ described

that Jackson had his first knee surgery in 2007; that in April 2008 Dr. Shine stated that Jackson's

range of motion had improved and he had no gait abnormalities; that Jackson's treatment notes

showed he maintained a normal, unassisted gait during 2008; that he continued to complain of

pain and discomfort and, therefore, underwent surgery in March 2009 to remove the hardware in

his knee; that, following this surgery, he continued to complain of some pain and discomfort when performing range of motion activities but he also showed good strength and an unassisted gait; in June 2009 Dr. Shine stated that Jackson could return to at least light duty work despite his symptoms; in August 2009 Dr. Shine stated that he could return to regular work duties following physical therapy if he felt able; and an August 2010 treatment note showed that Jackson continued to have a normal gait, despite some pain with range of motion in his knee. Tr. 18 (citing Tr. 342-349, 353-355, 372-374, 369-371, 375-377). The ALJ further described how Jackson did not receive treatment for his knee after August 2010; that he had a consultative examination with Dr. Cooper in October 2012 and that exam detailed completely normal findings, including normal extremities and a normal gait; and that, at the majority of Jackson's physical examinations performed after August 2010, his providers did not observe Jackson to have significant gait abnormalities or difficulties using his lower extremities. Tr. 19. This is substantial evidence cited by the ALJ that supports the ALJ's determination. *See* 20 C.F.R. § 404.1529 (an ALJ considers the claimant's complaints, objective medical evidence, treating or nontreating source statements, treatment received, and other evidence when assessing credibility).[11]

Next, Jackson asserts that the ALJ erred because she erroneously interpreted the circumstances that caused him to leave the workforce. Doc. 11, p. 19. He argues that the ALJ stated that Jackson lost his last job in 2009 because of a downturn in the economy, but Jackson submits that his last job was a "hybrid light duty position that was afforded him by his employer to keep him on the payroll and avoid the payment of WC benefits." Doc. 11, p. 19. Regardless of the characterization of the work he was performing in 2009, Jackson does not allege that the ALJ's statement that he lost his last job in 2009 because of a downturn in the economy was

---

[11] The ALJ also considered Jackson's complaints. Tr. 17-18, 21-22. *See* 20 C.F.R. § 404.1529.

inaccurate.  And the record supports the ALJ's statement.  *See* Tr. 366 (May 2009 treatment note: "[Jackson] is not scheduled to return to work.  He states my work closed up."); Tr. 49 (Jackson hearing testimony stating, "the terminal I worked at closed up.").  Substantial evidence supports the ALJ's credibility assessment and it must, therefore, be affirmed.  *See Jones*, 336 F.3d at 477.

### D. Substantial evidence does not support the ALJ's finding regarding the impact of the magnetic field restriction on the job base identified by the VE

Jackson argues that the ALJ's error with respect to the magnetic field restriction constituted an additional error: the restriction should have been in the ALJ's RFC assessment and the ALJ improperly usurped the role of the VE when she did her own research and concluded that a magnetic field restriction would not have any significant impact on the jobs base identified by the VE.  Doc 11, p. 20.

The ALJ did not include a magnetic field restriction in her RFC assessment and did not ask the VE to consider a magnetic field restriction at the hearing.  Jackson's attorney asked the VE what impact a magnetic field restriction would have on her answer regarding the jobs or number of jobs available that Jackson could perform and the VE answered that she had no information about what employment settings would have exposure to magnetic fields.  Tr. 69.  In her decision, the ALJ explained,

> Furthermore, while Dr. Quan stated that the claimant should not be exposed to magnetic fields in the workplace, there is little indication that this limitation would have any significant impact on the number of jobs available regionally or nationally.  The DOT does not contain any references to magnetic fields and the vocational expert did not have enough experience to evaluate the impact of this limitation.  However, according to the Center for Disease Control, there are no current federal limits for exposure to electromagnetic fields and Dr. Quan did not quantify the strength of the magnetic field that the claimant should avoid, which limits the usefulness of this limitation.  Overall, I find little support for finding that limiting the claimant's exposure to magnetic fields would have a significant impact on jobs available in the regional or national economy.[1]

[FN1] htty://www.cdc.gov/niosh/docs/96-129

Tr. 24.

Jackson does not cite relevant legal authority for his position that the ALJ erred when she consulted a governmental publication to decide a question the VE could not answer.  Nor does Defendant cite legal authority for her position that the ALJ did not err when she consulted a National Institute for Occupational Safety and Health ("NIOSH") publication to determine the significance of a magnetic field restriction on the jobs identified by the VE.  The undersigned notes that the regulations provide that the Social Security Administration may take administrative notice of "reliable job information available from various governmental and other publications," including, for example, the DOT (published by the Department of Labor), County Business Patterns (Bureau of the Census), Census Reports (Bureau of the Census), Occupational Analyses prepared by state employment agencies, and the Occupational Outlook Handbook (Bureau of Labor Statistics).  20 C.F.R. § 404.1566(d); *Gay v. Sullivan*, 986 F.2d 1336, 1340 (10th Cir. 1993) (the list of governmental sources in § 404.1566(d) is not exhaustive).  The undersigned also recognizes that an ALJ "is not allowed to substitute either his or her administrative notice of available jobs or the ALJ's own unsubstantiated opinion of whether a claimant can perform some work in the national economy for the testimony of a vocational expert with whom the ALJ disagrees."  3 Soc. Sec. Law & Prac. §§ 43:139, 43:140.  Here, the ALJ did not disagree with the VE; rather, the VE stated that she did not know the answer and the ALJ used the NIOSH data to supplement, not replace, VE testimony.

However, the undersigned does not need to decide the question whether the ALJ's reliance upon a NIOSH publication in this instance was erroneous because the undersigned finds that the information that the ALJ relied upon was insufficient to support her opinion that a

magnetic field restriction would not affect the job base identified by the VE.  The publication the ALJ relied upon provides a general description of electric and magnetic fields in the workplace that every worker is exposed to on a regular basis and whether such exposure has harmful health effects.  *See* https://www.cdc.gov/niosh/docs/96-129/ (last visited 1/25/2017).  The question before the ALJ and the VE, however, was a different one: whether a hypothetical worker who has an implanted defibrillator and a resultant work restriction to avoid magnetic fields could perform the specific jobs identified by the VE.  The VE could not answer that question; neither does the NIOSH publication answer that question.  Because substantial evidence does not support the ALJ's determination that the job base identified by the VE would not be affected by a restriction to avoid magnetic fields, her finding on this issue is reversible error.  On remand, if the ALJ gives controlling weight to the magnetic field restriction in Dr. Quan's opinion and includes a magnetic field restriction in her RFC assessment, she should consult a VE who has or can obtain knowledge on the subject to determine what effect, if any, a magnetic field restriction would have on the job base identified by the VE.

### D.  The ALJ did not err in relying upon the remainder of the VE's answer

Jackson argues that the ALJ erred when she relied upon the VE's answer to her hypothetical question because the hypothetical was based upon the "flawed RFC" and was not supported by substantial evidence.  Doc. 11, pp. 21-22.  He complains that the ALJ should have included a sit/stand/lie option in her RFC, and that that VE had testified, upon questioning by Jackson's attorney, that a sit/stand/lie option would preclude work.  Doc. 11, p. 21-22.

The undersigned notes that the VE testified only that a restriction that the hypothetical individual be permitted to lie down at irregular intervals would preclude work.  Tr. 70.  A sit/stand option would not preclude work.  Tr. 68.  The ALJ was not required to include a lie-

down-at-irregular-interval limitation in her hypothetical to the VE because she did not include such a limitation in her RFC.

Furthermore, the ALJ's hypothetical question to the VE, consistent with the ALJ's RFC, included a limitation for standing and walking for three hours a day and sitting for six. Tr. 67-68. The VE stated that such a limitation would be akin to a sit/stand option and that the following jobs would be available in the following numbers: assembler (4,000 regional jobs; 90,000 national jobs); inspector (1,800 regional jobs; 30,000 national jobs); and cashier (9,000 regional jobs; 200,000 national jobs). Tr. 68, 69. In her decision, the ALJ listed the following jobs that Jackson could perform: assembler (4,000 regional jobs; 90,000 national jobs); inspector (1,800 regional jobs; 30,000 national jobs); and cashier (9,000 regional jobs; 200,000 national jobs). Tr. 24. In other words, even if the ALJ did not use the words "sit/stand option" in her RFC, the VE testified that standing and/or walking for 3 hours a day equated to a sit/stand option and provided job numbers that are substantial and upon which the ALJ relied. Thus, the ALJ did not err when she relied on the VE's testimony.

Lastly, Jackson argues in this section that the ALJ erred because she should have credited Dr. Quan's restriction that Jackson sit/stand/lie at regular intervals. Doc. 11, p. 22. Jackson did not argue, in her section challenging the ALJ's treatment of Dr. Quan's opinion, that the ALJ should have given this restriction by Dr. Quan controlling weight. Even if the undersigned were to entertain such an argument, it would fail. As discussed above, the ALJ's explanation with respect to Dr. Quan's opinion (except the magnetic field restriction) was not error. Moreover, the form Dr. Quan completed asked the following question to which Dr. Quan answered "yes": "the claimant needs to change positions often and at will (alternate between sitting, standing, lying) at irregular intervals to relieve pain." Tr. 1029. The form did not specify that Jackson

40

needed to lie down to relieve pain, nor did Jackson testify that he needed to lie down to relieve pain.  *See Poe*, 342 Fed. App'x at 157 (The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician, and the ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding.").  Indeed, Jackson does not identify any evidence in the record indicating that he needs to lie down to relieve pain.  For all these reasons, his argument fails.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Dated: January 26, 2017

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

41